FILED
JAMES BONINI
CLERK

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

06 OCT 17 PM 4:16

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
EAST. DIV. COLUMBUS

| | |
|---|---|
| United States ex rel. | Civil Action No. |
| | |
| Philip Borris, | **COMPLAINT** |
| | |
| Michael Eversole, | C2 06 873 |
| | **JUDGE WATSON** |
| Rodney Gossett, and | MAGISTRATE JUDGE ABEL |
| | |
| Thomas McDermott, | Complaint filed UNDER SEAL. |
| | pursuant to 31 U.S.C. §3730(b)(2) |
| Relators, | |
| | |
| BRINGING THIS ACTION ON | Captioned as: |
| BEHALF OF THE UNITED STATES | United States ex rel. Borris et al. v. |
| OF AMERICA` | Bechtel-Jacobs, Co., LLC, et al. |
| | |
| Gregory Lehman | |
| United States Attorney | |
| Columbus, Ohio | |

and

c/o John Ashcroft
Attorney General of the
    United States
United States Department of Justice
10th & Constitution Avenues, N.W.
Washington, D.C. 20530

Plaintiffs,
    v.

Bechtel-Jacobs, Company, LLC,
Safety Ecology Corporation, and
McDonald Consulting Corporation.

Portsmouth Gaseous Diffusion Plant, in the name of the United States Government, to recover penalties and damages arising from false claims submitted to the United States Government by Defendants Bechtel Jacobs, LLC and Safety Ecology Corporation ("hereinafter Defendants") and to recover damages and other relief for violations of 31 U.S.C. § 3730(h) by their employers, Defendants Bechtel Jacobs, SEC, and Defendant McDonald Consulting Corporation (hereinafter "Defendant McDonald").

2.    Defendant Bechtel Jacobs entered into a contract with the Department of Energy to plan, manage, integrate, and execute the comprehensive environmental remediation effort at the Department of Energy's Portsmouth Diffusion Plant site in Piketon, Ohio.

3.    Defendants Safety Ecology (SEC) Corporation and McDonald Consulting Corporation entered into various subcontract agreements with Bechtel Jacobs to provide services to the United States Government as a subcontractor at the Piketon site.

4.    Defendants Bechtel Jacobs and SEC knowingly submitted or caused to be submitted false claims to the Government while performing under this Government remediation contract and thereby violated the False Claims Act and/or caused Defendant Bechtel Jacobs to violate the False Claims Act. Defendants further made false statements or caused to be made false statements to the Government in order to get claims for payment paid by the Government.

False Claims Act. Defendants knowingly falsely represented, either directly or indirectly, to the Government, through the submission of false claims, that they performed the required contractual obligations and satisfied the requirements for cost recovery and fees, awards, and incentives under the contract between the Department of Energy and the Defendant Bechtel Jacobs.

6. Defendants' False Claims Act violations primarily involve their overcharges to the Government, billing for services not rendered, failure to fulfill contract requirements and nonetheless billing as if those requirements were satisfied, particularly tasks and services involving health, safety, and environmental protection and remediation, particularly with respect to control of radioactive and chemical exposures, oversight of safety, radioactive wastes, waste management, environmental remediation activities, management of Department of Energy material storage areas (DMSA's), and recycling of contaminated materials.

**PARTIES**

7. Relators are individual citizens of the United States of America. Relators bring this civil action for violations of 31 U.S.C. §3729(a) for themselves and for the United States Government pursuant to 31 U.S.C. §3730(b)(1).

8. Relator Phil Borris has worked at the Portsmouth Gaseous Diffusion Plant since 1991 and is currently a site manager there, employed by Defendant SEC pursuant to its subcontract with Bechtel Jacobs. His responsibilities over the past 10 years have included direct supervision of Radiological Control Technicians (RCT's) and the development, management, and technical oversight of radiation protection programs, including management of SEC's radiation,

Page 3 of 45

safety and industrial hygiene protection duties under the Bechtel Jacobs prime

contract with the Department of Energy.  He resides in Chillicothe, Ohio.

9.    Relator Mike Eversole has worked at Portsmouth Gaseous Diffusion Plant since

1989 and is currently the Project Health Physicist employed by Bechtel Jacobs.

His responsibilities over the past several years have included development,

management, and technical oversight of the radiological control program,

including field operations; internal, external, and radiation instrument calibration,

and dosimetry operations.  He resides in Waverly, Ohio.

10.    Relator Rod Gossett has worked at the Portsmouth Gaseous Diffusion

Plant since 1980 and is currently Site Health and Safety Manager, employed by

Defendant SEC.  His responsibilities over the past several years have included

developing and implementing industrial hygiene and safety programs, oversight

of industrial monitoring programs, and investigations and solution development

for industrial hygiene and safety concerns.  He resides in Chillicothe, Ohio.

11.    Relator Thomas McDermott worked at the Portsmouth Gaseous Diffusion Plant

for a Bechtel Jacobs subcontractor, Defendant McDonald Consulting

Corporation, until he was unlawfully terminated by his employer, Defendant

McDonald.  He is currently employed by the State of Tennessee, where he

resides.

12.    Defendant Bechtel Jacobs is a corporation, with its principal places of business

in Oak Ridge, Tennessee.  Defendant transacts business at the Department of

Energy nuclear site in Piketon, Ohio, where many of the violations alleged herein

occurred, at least in part.

Page 4 of 45

13.   Defendant Safety and Ecology Corporation (SEC), is a corporation, with its principal place of business in Oak Ridge, Tennessee.   Defendant SEC has provided services as a subcontractor to the United States under the Bechtel Jacobs contract with the Department of Energy.   SEC is the subcontractor assigned to ensure overall site health and safety controls involving radiation control and industrial hygiene.

## JURISDICTION AND VENUE

14.   This action arises under the False Claims Act, 31 U.S.C. §§ 3729 et seq.

15.   Jurisdiction in this action is conferred on this Court by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

16.   Venue is proper in the United States District Court for the Southern District of Ohio, Eastern Division pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because Defendants do business in and are located in this District and Division, many of the violations occurred in this District and Division, 3 of the 4 Relators reside in this District and Division, and the Department of Energy site referred to herein is located in this District and Division.

## FACTUAL ALLEGATIONS

### The Portsmouth Gaseous Diffusion Plant, Piketon, Ohio

17.   The Portsmouth Gaseous Diffusion Plant is one of the nation's three uranium enrichment facilities and sits on 3,708 acres of land near Piketon, in Pike County, Ohio.

18.   The Portsmouth Gaseous Diffusion Plant is owned by the United States Department of Energy ("DOE").   It was first operated under contract by

Page 5 of  45

Goodyear Atomic from 1956 to 1986, followed by Lockheed Martin Energy

Systems (formerly Martin Marietta Energy Systems) from 1986 to 1998. During

the time when Lockheed Martin was the DOE's overall site management

contractor, on July 1, 1993, DOE transferred control of active uranium

enrichment facilities to the United States Enrichment Corporation ("USEC").

USEC was initially a wholly owned Government corporation created by Congress

in a largely unsuccessful attempt to safely transform the DOE's uranium

enrichment enterprise into a profitable business. USEC was "privatized" on July

28, 1998. USEC operates another former DOE enrichment facility located in

Paducah, Kentucky and also has operations at the former DOE site in Oak

Ridge, Tennessee.

19.    When it began operations in 1954, the Portsmouth Gaseous Diffusion Plant's

mission was to enrich uranium, that is, increase the concentration of U-235 in

natural uranium, for national defense and commercial purposes. Naturally, only

0.711% U-235 is found in uranium. Through the gaseous diffusion process,

uranium hexafluoride ($UF_6$) is passed through a series of converters and

compressors to yield a product highly enriched in the amount of U-235, so that it

was suitable for use in nuclear weapons and nuclear propulsion programs.

Uranium at two to seven percent enrichment was removed as a side product for

use in light water reactors. At present, the Portsmouth Gaseous Diffusion Plant

works in tandem with a Department of Energy/USEC site at Paducah, Kentucky

to produce low grade, commercial uranium for use by civilian power. Paducah

performs the initial phase of separating uranium for reactor fuel and then ships

its product to the Portsmouth Gaseous Diffusion Plant for container transfer and

Page 6 of 45

shipment to USEC's final customer.

20.  Byproducts of the gaseous diffusion process at Portsmouth include spent
     solvents and other chemical and radioactive contaminants that were disposed of
     in on-site landfills and surface impoundments.  The chemical contaminants
     included chlorinated solvents (such as trichloroethylene or TCE), chlorinated
     solvents mixed with radionuclides in low concentrations, polychlorinated
     biphenyls (PCB's), and metals.  Radioactive contaminants found in process
     equipment, buildings, cooling towers, burial grounds, and wastewater ponds
     include uranium, plutonium, neptunium, and technetium.

21.  Contaminants at the site endanger the environmental quality of two aquifers
     beneath the Portsmouth Gaseous Diffusion Plant , that store and supply ground
     water. Radiological and chemical contamination from the site has been detected
     in Little Beaver Creek and Big Run Creek.  The Little Beaver Creek is the largest
     naturally-flowing body of water at the Portsmouth Gaseous Diffusion Plant.
     During much of the year, particularly in summer, wastewater from the
     Portsmouth Gaseous Diffusion Plant is the source of most of the flow in the Little
     Beaver Creek, which empties, after leaving the site, into the Big Beaver Creek.
     The Big Beaver Creek is a tributary of the Scioto River, which then empties into
     the nearby Ohio River, the drinking water supply for millions of citizens residing
     downstream from Portsmouth.

22.  Pursuant to federal law and court orders (consent decrees), the Department of
     Energy has contracted with several prime contractors to undertake a massive
     environmental cleanup of the Portsmouth site.  The effort began in the 1980's
     and is still underway.  Defendant Bechtel Jacobs is responsible under the current

Page 7 of  45

contract to assure the thorough implementation of effective environmental control, worker safety, and environmental remediation.

### Bechtel Jacobs' Environmental Remediation Contract at the Portsmouth Gaseous Diffusion Plant

23.    On December 18, 1997, DOE awarded Defendant Bechtel Jacobs the five and one-half year management and integration contract.  On April 1, 1998, Defendant Bechtel Jacobs assumed responsibility as the management contractor for environmental management and contract integration at the Portsmouth Gaseous Diffusion Plant.  Its contractual responsibilities are for environmental restoration, waste management, removal of highly enriched uranium, and operation of non-leased facilities (facilities that are not leased to USEC).

24.    Defendant Bechtel Jacobs's contract requires that it manage all wastes generated at the site, including toxic and hazardous chemicals and materials and radiological contaminates.  Wastes must be identified and stored in accordance with all environmental regulations.  Defendant's waste management program also arranges transportation and off-site disposal of waste.  The goal is to manage waste from the time it is generated until its ultimate treatment, recycling, or disposal in accordance with all applicable regulations. Defendant is also contractually responsible for maintaining a safe and regulatory compliant infrastructure at all non-leased buildings and for administering the lease with USEC.

25.    Defendant Bechtel Jacobs operates the environmental restoration, waste management, and highly enriched uranium removal programs at the Portsmouth

Gaseous Diffusion Plant, as well as other non-leased DOE property. The
environmental restoration staff are to perform remedial investigations to define
the nature and extent of radioactive and chemical contamination, evaluate the
risk to public health and the environment, and determine the available
alternatives from feasibility studies of potential remedial actions for sites under
investigation. The goal of the environmental restoration program is to verify that
releases from past operations and waste management at the Portsmouth
Gaseous Diffusion Plant are thoroughly investigated and that effective and
appropriate remedial action is taken to protect human health and the
environment.

26.     As set forth in Defendants' contracts and subcontracts, the conditions at the
Portsmouth Gaseous Diffusion Plant make it imperative that workers be made
constantly aware of potential health risks, that workplace safety information and
equipment and protective gear be provided, and that radiation and chemical
exposure data is consistently and accurately monitored, recorded, and
maintained.

### False Claims Act Allegations

27.     Defendant Bechtel Jacobs engaged in a scheme to violate the False
Claims Act in a number of ways while performing work under its Government
contract, including, but not limited to:

a.     Making false statements that described large quantities of scrap
fencing as radiologically contaminated, when in fact it was not, thus
falsely representing that it had qualified for an enhanced
performance payment from the Department of Energy for removal of
radiologically contaminated waste material from the Portsmouth
Gaseous Diffusion Plant site;

Page 9 of  45

b.   Allowing outdoor radioactive material scrap areas to exist, such
that in X-747-H and be remediated in violation of contractual
environmental, health, and safety requirements, in order to avoid
expenditures of labor hours and materials, and thereby endangering
the safety of workers and the surrounding community;

c.   Approving premature reduction of site security controls for Special
Nuclear Materials (SNM), in X-6619, X-752, X-744W, X-611, X-747-
H, in 60 surplus/contaminated vehicles, plant equipment located
near X-752, and other locations involving rad waste and low
enrichment residues, prior to confirming that it was safe to do so,
including knowingly allowed public access to various areas of the
DOE reservation without verifying all areas were free of SNM in
order to increase eligibility for DOE performance based initiatives
(PBI) in the area of HEU suspension;

d.   Intentionally and improperly handling materials and/or wastes in
Building X-7725, including: a) Intentionally and falsely labeling
chemical waste materials in storage in Building X-7725 as
radioactive and treating them as "mixed wastes" to avoid RCRA and
contractually-required reporting and handling of non-radioactive
environmental wastes under RCRA, including to remove the
materials from the site within 90 days; b) removing and otherwise
handling improperly a radiologically contaminated bottle in the X-
7725 poly bottle storage area; and c) allowing paints to solidify on
the second floor, rather than treating them as they are in their
current state, a hazardous waste, because they are ignitable;

e.   Failing to conduct appropriate radiological surveys and release
plans in conjunction with removing items from the X-326 facility and
in conjunction with operations relating to X-752 and X-744H, and
thus without contractually and legally-required protection of the
workers and public from possible exposure to nuclear wastes, nor
even labeling or disclosing the possibility that the materials were
radioactively contaminated;

f.   Falsely stating the number of hours worked on Government
contracts by charging the Government for unnecessary work or work
that was not performed; and

g.   Intentionally destroying site survey documents, in violation of
contract document preservation requirements and additional explicit
directives.

28.   Defendant Bechtel Jacobs made false statements in connection with the

closures of landfills that did not accurately describe the radiological

contamination and potential radiological risks to workers, the surrounding

community, and the nearby waterways.

Page 10 of 45

29. Defendant Bechtel Jacobs intentionally did not properly maintain, in violation of contract requirements, the closed landfills, X-749-B (officially designated as containing or formerly containing radiological waste) and the Peter Kiwiet landfill (officially designated as containing only non-radiological construction debris), both having environmentally significant leakage of toxic, radioactive, and hazardous chemicals into adjoining waterways, including high rates of technetium seepage into an adjacent ditch, which has an oily sheen that is capable of being observed by the naked eye.

30. Defendant Bechtel Jacobs intentionally misrepresented compliance with contract terms in the management and/or closing of Landfills X-701-B, X-734-A, X-734-B, and X-735 by failing to handle the sites in conformance with requirements for sites with radiological wastes. Site X-735 contains radiologically contaminated materials and/or wastes from Building X-326 that were not surveyed prior to their disposal and were deposited in the landfill prior to a site visit by Admiral Watkins and, thus, knowingly mislabeled by and mis-managed by Defendant Bechtel Jacobs and the predecessor DOE contractor, Lockheed Martin Energy Systems (formerly Martin Marietta Energy Systems, in contravention of contract terms.

31. Defendant Bechtel Jacobs' false statements and claims regarding the X-701-B, X-734-A, X-734-B, X-735 , X-749-B, and Peter Kiwiet landfills include:

    a. Misrepresenting or not reporting accurately the environmental remediation status of the landfill sites mentioned herein and the adverse developments in the sites to the Department of Energy as

required by contract;

b.  Managing the landfills in violation of the remediation requirements set by the DOE contract, and in violation of the obligation by Defendant Bechtel Jacobs to report the severity of the radioactive and chemical contamination to DOE, the EPA, and other affected state and federal health and environmental protection agencies;

c.  Not sampling or monitoring the sites for chemical exposures for volatile organic compounds, mercury, and other toxic and hazardous chemicals as required by contract and the regulations incorporated thereunder, including 29 C.F.R. Parts 1910 and 1926;

d.  Not monitoring, in conformance with contract requirements, the sites having the potential to release a technetium compound, Tc-99, and plutonium and, thereby allowing such high levels of contamination leaching out of Landfill X-701-B, which is radiologically contaminated and has high levels of a technetium compound (Tc-99), that Tc-99-contaminated waste flows from Landfill X-701-B into an open, adjacent ditch and that a groundhog living in the vicinity was radiologically contaminated at very high levels;

e.  Not capping the X-734-A site with material appropriate for radiological wastes;

f.  Falsely claiming that X-735 was a sanitary landfill without radiological wastes; and

g.  Allowing the discharge and continued offsite release of effluents containing ionizing radiation and contaminants into adjacent waterways which eventually flow into the Scioto River and from there into the Ohio River, the drinking water supply for millions of citizens who live downstream from the site, including residents of Cincinnati, Ohio and Louisville, Kentucky.

32.  Defendants made, presented, or caused to be presented false statements and claims and charged the Government for work performed in violation of contract terms, thus exposing workers unnecessarily to unlawful levels of toxic, radioactive and chemical contamination, through contact, proximity, contamination, inhalation, and ingestion, including by Defendants failing to fulfill contractual requirements to:

a.  Implement the Integrated Safety Management System (ISMS) program required by its contract, placing employees, the site, the public, and the environment at risk, and thus, precluding a coordinated work plan whereby environmental, health, and safety work is fragmented, with remediation efforts performed in an unsafe manner and cost-ineffective manner.  The result is

increased risk of radiation, toxic, and hazardous chemical exposures, injury, and contamination. Another result is increased clean-up costs improperly charged to the Government when exposures and contamination occurs unexpectedly. If Defendants had ensured the contractually-required advance planning and coordination under ISMS, for which the Government is already compensating Bechtel Jacobs under the contract, they would have precluded the need for the special clean-up overcharges billed to the Government;

b.     Conduct adequate safety and health planning prior to undertaking environmental remediation and other tasks as required by the contract, but nonetheless billing the Government as if such planning had occurred, and unnecessarily exposing the workforce to toxic and hazardous chemicals and creating the need for more expensive remediation efforts after incidents occur;

c.     Identify existing levels of radioactivity and potential for hazards to the workforce;

d.     Monitor and control toxic and hazardous chemicals (including asbestos, lead, hydrogen fluoride, volatile organic compounds, nickel, mercury, chromium, polychlorinated biphenyls ("PCB's"), and arsenic) and avoid worker exposures, as required by contract terms;

e.     Use adequately trained staff to monitor radiation and other toxic and hazardous chemical levels, resulting in data not meeting required accuracy and reliability;

f.     Provide adequate industrial hygiene air monitoring, testing, and laboratory equipment and services to fulfill contractual requirements, and identify chemical exposures to workers and the public;

g.     Post required radiological cautionary notices and control exposures to radiation and radioactive contamination in areas with toxic and hazardous chemical contamination, including areas of radioactive and PCB contamination;

h.     Report radiation hazards and chemical exposure hazards to the workers and regulatory authorities;

i.     Accurately inform the Department of Energy of environmental and health and safety hazards presented;

j.     Take actions to prevent re-occurrence of accidents and worker exposures through use of properly qualified staff and equipment, employee training, and other methods required by contract and for which Defendants bill the Government; and

k.     Charge to the Government only proper charges under the contract, which would not include labor hours incurred as result of repeating tasks not properly performed in the first instance.

31.     Defendants falsely represented that their radiological surveys were in

Page 13 of 45

conformance with contract requirements when in fact they:

    a.    were based upon incomplete or undocumented survey results;

    b.    were performed by inadequately trained staff and, thus, personnel not qualified to reliably perform the surveys;

    c.    falsely reported that radiation was within allowable limits when in fact the radiation contamination levels had not been verified;

    d.    were altered in violation of 10 CFR 835 by supervisors and management without basis in fact nor consistent with required contractually mandated procedures;

    e.    improperly allowed release of materials and areas from radiological controls when the actual surveys did not justify it;

    f.    improperly caused areas not to be posted as hazards, as required by the contractual mandate that the work site be posted in conformance with the provisions of 10 C.F.R. 835;

    g.    had a high rate (50%) of failure to properly document radiation risks to safety and health at the site; and

    h.    falsely suggested or represented that the site was being safely managed, monitored, and remediated in accord with applicable federal environmental, health, and safety laws, including but not limited to 10 C.F.R. Part 835.

31.    As of 1999 there were several hundred polychlorinated biphenyl (PCB) spill sites within areas controlled by Bechtel Jacobs. Defendant Bechtel Jacobs's contract with the Department of Energy required radiological and environmental controls for these spill sites. However, none were instituted until 2000 and 2001. But, Defendant Bechtel Jacobs nonetheless billed the Government prior to when the controls were instituted as if such controls had been operating during the entire contract period and were in place to protect the workforce and the public.

32.    In 2000, there were over 17,000 cylinders of depleted uranium hexafluoride, $UF_6$, stored at the Portsmouth Gaseous Diffusion Plant. The 17,000-plus cylinders are stored in what is termed "cylinder yards." Most of the cylinders are 14 ton-size units. From time to time, these cylinders leak, which primarily occurs at the Portsmouth site when a cylinder control valve fails. When these cylinders leak,

$UF_6$ reacts with air to form compounds of uranium and fluorine. Some of these compounds are solid and plug the leak, but the metal continues to corrode. Radiation, radioactive contamination, and hydrogen fluoride (a deadly gas even when diluted by air) can then escape. Defendant Bechtel Jacobs's contract required effective controls to preclude release of $UF_6$. However, none have ever been instituted and Defendant Bechtel Jacobs has intentionally failed to fulfill this contract requirement. But, Defendant Bechtel Jacobs has nonetheless billed the Government as if controls were in place to protect the workforce and the public.

33.    Defendant SEC engaged in a scheme to violate the False Claims Act and thereby caused Defendant Bechtel Jacobs to violate the Act, while performing work under its subcontract with Bechtel Jacobs including, but not limited to, in these ways:

a.    Presenting false requests for payment by altering workers' time entries from that which was not compensable by the Government (including, but not limited to, training, administration, paid break times, and for periods when no work was available to be performed) to categories compensable by the Department of Energy;

b.    Failing to comply with the applicable Radiation Protection Program and 10 C.F.R. 835, entitled "Occupational Radiation Protection," by not taking required radiological measurements, but nonetheless completing records as if measurements had been made; increasing the risk of workforce exposure to ionizing radiation and radioactive contamination;

c.    Misrepresenting radiological measurement data by basing the measurements upon surveys undertaken in a manner that could not accurately provide valid survey results, including surveys made by inadequately trained and, thus, unqualified staff, and not following required procedures for such radiological surveys, thereby increasing the risk of workforce exposure to ionizing radiation and radioactive contamination;

d.    Falsifying radiological records by filling in "missing" information without adequate basis for doing so, misrepresenting the identity of the person obtaining the data or filling out material portions of the report forms, causing improper releases of materials from

Page 15 of 45

radiologically-monitored areas to non-monitored areas, and causing areas not be monitored, but which the contract requires are to be monitored for radioactive contaminants.

**Department of Energy Environmental, Health, and Safety
Contract Requirements**   .

34.    In order to obtain its contract with the Department of Energy, Defendant Bechtel

Jacobs responded to a request for proposal and affirmatively agreed to

undertake the tasks therein and, as a result, a 66 month (5 and one-half years)

contract for environmental remediation services at the Piketon site was entered

into.  But for its representations in this regard, the Department of Energy would

not have awarded the contract to Defendant Bechtel Jacobs.

35.    Pursuant to the requirements of its 1997 contract award, Defendant Bechtel

Jacobs was required to fulfill environmental, health, and safety obligations:

> In performing work under this contract, the Contractor shall comply with the requirements of applicable Federal, State, and local laws and regulations (including DOE regulations), unless relief has been granted in writing....[Section I-99, p. I-144].

> The Contractor shall manage and integrate environmental restoration activities at BJLLC's Oak Ridge Operations (ORO)  [Oak Ridge, Tennessee], Portsmouth, and Paducah sites. The Contractor shall **** perform legacy waste management at Portsmouth and Paducah. **** The Contractor shall perform ....  Validation of waste inventories and databases; Development and evaluation of technical plans, costs, and work-off schedules for treatment/storage/disposal of waste; and Establishment of programs for waste certification and characterization.     *     *     *     *     *

> The Contractor shall handle, package, store, treat, and dispose the radioactive, hazardous, sanitary, solid, and mixed wastes.  This includes the operation of all necessary facilities and services. [Section C-3, p. C-8 through C-10].

36.    Bechtel Jacobs has specific contractual obligations arising from the special

nature of the radioactive materials at Piketon:

Page 16 of  45

The Contractor shall comply with all applicable regulations of DOE and with those requirements (including reporting requirements and instructions of DOE] concerning nuclear safety including reporting requirements and instructions of DOE concerning nuclear safety of which it is notified in writing by the Contracting Officer. **** In the operation and maintenance of any nuclear facility under this contract, the Contractor shall (1) Use all reasonable efforts to assure that all operational and maintenance activities are performed by qualified and adequately trained personnel and are conducted under the supervision of personnel who are qualified and authorized to evaluate any emergency condition and take prompt effective action with respect thereto. (2) Operate the facility within the technical safety requirements or operational safety requirements which are approved by the Contracting Officer. [Section H-35, page H-29, 30].

The Contractor shall take all reasonable precautions in the performance of work under this contract to protect the safety and health of employees and of members of the public against the hazards of ionizing radiation and radioactive materials and shall comply with all applicable radiation protection and nuclear criticality safety standards and requirements (including reporting requirements) of DOE. The Contractor shall submit its management program and implementation plan as part of the documentation for the Integrated Safety Management System.... Prior to starting any work in radiological areas, the Contractor shall have in effect a documented Radiation Protection Program approved by DOE as required in section 101 of 10 C.F.R. 835. [Section I-82, page I-24.]

37. Defendant Bechtel Jacobs had an obligation under the contract to plan and

manage the environmental, health and safety functions of the work, in order to

maximize safety and minimize expense to the Government. The contract states,

inter alia:

(a) For purposes of this clause:

(1) Safety encompasses environment, safety and health, including pollution prevention and waste minimization; and
(2) Employees include subcontractors' employees.

(b) In performing work under this contract, the Contractor shall perform work safely, in a manner that ensures adequate protection for employees, the public, and the environment, and shall be accountable for the safe performance of work. The Contractor shall exercise a degree of care

Page 17 of 45

commensurate with the work and the associated hazards. The Contractor shall ensure that management of environment, safety, and health (ES&H) functions and activities becomes an integral but visible part of the Contractor's work planning and execution processes. The Contractor shall, in the performance of work, ensure that:

(1) Line management is responsible for the protection of employees, the public, and the environment.
(2) Clear and unambiguous lines of authority and responsibility for ensuring ES&H compliance are established and maintained on all organizational levels.
(3) Personnel possess the experience, knowledge, skills, and abilities that are necessary to discharge their responsibilities.
(4) Resources are effectively allocated to address ES&H, programmatic and operational considerations. Protecting employees, the public, and environment is a priority whenever activities are planned and performed.
(5) Before work is performed, the associated hazards are identified evaluated and protective actions are agreed upon. A set of ES&H standards and requirements, which if properly implemented, provide adequate assurance the employees, the public, and the environment are protected from adverse consequences.
(6) Administrative and engineering controls to prevent and mitigate hazards are tailored to the work being performed and associated hazards or potential hazards. Emphasis should be on designing the work and/or controls to reduce or eliminate the hazards and to prevent accidents and unplanned releases and exposures.
****

(c) The Contractor shall manage and perform work in accordance with a documented Safety Management System (System) that fulfills all conditions in paragraph (b) of this clause at a minimum. Documentation of the system shall describe how the Contractor will:
(1) Define the scope of the work;
(2) Identify and analyze hazards associated with the work;
(3) Develop and implement safety controls;
(4) Perform work within controls; and
(5) Provide feedback on adequacy of controls and continue to improve safety management.
****

(e) ***Resources shall be identified and allocated to meet the safety objectives and performance commitments as well as maintain the integrity of the entire system. Accordingly, the System shall be integrated with the contractor's business processes for work planning, budgeting, authorization, execution, and change control.

(f) The Contractor shall comply with and assist the Department of Energy in complying with ES&H requirements of all applicable laws and regulations....

****

(g)  The Contractor shall promptly evaluate and resolve any noncompliance with all applicable ES&H requirements under the System.  .
****

(h)  The Contractor is responsible for compliance with the ES&H requirements applicable to this contract regardless of the performer of the work.  [Section I-89, pages I-133, 134, 135, emphasis added].

****

The Contractor shall obtain, review, and maintain a Material Safety Data Sheet (MSDS) in a readily accessible manner for each hazardous material (or mixture containing the hazardous material) ordered, delivered, stored or used.  The Contractor agrees to maintain an accurate inventory and history of use of hazardous materials at each use and storage location.  [Section H-37, page H-31].

****

(c)  Environmental, safety, and health (ES&H) requirements appropriate for work conducted under this contract may be determined by a DOE approved process to evaluate the work and the associated hazards and identifying an appropriately tailored set of standards, and controls.  When such a process is used, the set of tailored ES&H requirements as approved by DOE pursuant to the process shall be incorporated into the list as contract requirements with full force and effect.  [Section I-99(c), page I-145].

42.    Bechtel Jacobs had specific obligations to ensure proper management and

remediation of depleted uranium hexafluoride (DU) cylinders and sites containing

polychlorinated biphenyl (PCB).  The contract states:

> The Contractor shall:
> (1) Execute the Depleted Uranium hexafluoride (DU) cylinder program consistent with the Implementation Plan for Defense Nuclear Safety Board recommendation 95-1.  Activities include cylinder inspections, coating, data tracking, cylinder handling and stacking, maintenance of cylinders, cylinder yards and equipment, and management of substandard cylinders. ***
> (2) Execute the polychlorinated biphenyl (PCB) collection and containment program consistent with the requirements defined in the Toxic Substance Control Act....  Activities include inspection, maintenance, analysis, cleanup, and reporting. [Section C-6, page C-15].

43.    Defendant Bechtel Jacobs' contract further requires that it provide an accurate

and complete annual toxic chemical release inventory form available for public

Page 19 of  45

review:

> Unless otherwise directed, the Contractor... shall file by July 1 for the prior calendar year an annual toxic chemical release inventory form (Form R).... The Contractor shall file, for each facility subject to the Form R filing and reporting requirements, the annual Form R throughout the life of the contract. [Section I-40].

### Contract Compensation Provisions

44.    Under its contract with the Department of Energy, Defendant Bechtel Jacobs is subject to the following provisions intended by the Government, <u>inter alia</u>, to avoid payment for services not rendered, not rendered in the manner specified in the contract, or not completed timely:

> (a) Performance-based fee. A performance-based fee(s) shall be paid to the Contractor for the accomplishment of contract performance objectives in accordance with the provisions of this clause and the clause entitled "Payments and Advances" in Section I. These incentive fees are intended to maximize Contractor performance in accomplishment of the Statement of Work and other areas of contractual requirements as appropriate. The performance-based fee shall be applicable to the period beginning April 1, 1998, and continue throughout the term of the contract.\*\*\*
> (c) Performance objectives are to be used by the Government to evaluate the Contractor's performance and to determine the amount of the performance-based fee that is earned by the Contractor. \*\*\* The performance objective will encompass such areas as costs; schedule; technical performance; environment; safety and health performance; and performance of other contract requirements, as appropriate. \*\*\*
> (e)(1) The Government shall evaluate the Contractor's performance against the performance objectives, and the Contracting Officer shall determine the amount of performance-based fee earned. The Contracting Officer shall consider information, if any, submitted by the Contractor with respect to the Contractor's performance. [Section H-13, pages H-9 through H-11].
>
> (a) In order for the Contractor to receive all otherwise earned fees under the contract in a fiscal year, the Contractor must meet the minimum requirements in paragraph (1) through (4). If the Contractor does not meet the minimum requirements, the Contracting Officer may reduce the fiscal year's otherwise earned fees as described below.

Page 20 of 45

(1)  Minimum Requirements for Environmental Safety & Health (ES&H) program.  The Contractor shall develop, obtain DOE approval of, and implement a Safety Management System in accordance with the provision of the clause entitled "Integration of Environment, Safety and Health into Work Planning and Execution" in Section I.  The minimal performance requirements of the program will be set forth in the approved safety management system or similar document.  [Section H-34, page H-27].

(a)(4) In the case of a performance-type fee/incentive, the incentivized requirements must be performed within their specified cost.  Further, the performance of incentivized requirements must not result in an adverse impact to the cost of the performance of all other unrelated requirements. [Section H-34, page H-28].
****

If any price, including profit or fee, negotiated in connection with this contract, or any cost reimbursable under this contract, was increased by any significant amount because:
(1) the Contractor or a subcontractor furnished cost or price data that were not complete, accurate, and current as certified in its Certificate of Current Cost or Pricing Data;
(2) a subcontractor or prospective subcontractor furnished the Contractor cost or pricing data that were not complete, accurate, and current as certified in the Contractor's Certificate of Current Cost or Pricing Data; or
(3) any of these parties furnished data of any description that were not accurate, the price or cost shall be reduced accordingly, and the contract shall be modified to reflect the reduction. [Section I-12, page I-19]

(b)  Contractors which include unallowable indirect costs in a proposal may be subject to penalties.

(c)  The Contractor shall not include in any proposal any cost which is unallowable.... [Section I-61, page I-19].

45.  In Appendix G of the contract, Defendant Bechtel Jacobs agreed to abide

by certain "Fee Guidelines," including exclusions for any cost of rework

attributable to the Contractor and others. [Page J-25].

46.  In Appendix F to the contract, entitled "Performance-Based Fee and

Performance Objectives," Defendant Bechtel Jacobs agreed that its

performance-based fee will be linked to the achievement of performance

Page 21 of  45

objectives and the completion of milestone activities. These performance

objectives or "Milestone" activities include:

> 2.(a)  Environmental Restoration Projects
> ****
>> −Complete Portsmouth Peter Kiewit Landfill remediation by September 30, 1998.
>
> (b)  Waste Management Projects
> ****
>> − Meet all Site Treatment Plan/Mixed Waste Order Milestones and commitments, including completing treatment of all legacy incinerable RCRA-mixed waste by September 30, 1998
>> − Meet all requirements of the Toxic Substances Control Act Compliance Agreement between DOE and the Environmental Protection Agency, Region 4, by September 30, 1998.
>
> Consistent with the universality of its application, environment, safety, and health has been defined as a separate category to which a performance-based fee will be allocated. The performance objectives set out for environment safety and health are:
>> Identify the necessary safety standards and requirements for the work and implement revised Work Smart Standard by September 30, 1998;
>> Maintain safety performance to ensure that occupational illness and injury incident rates do not exceed nation-wide industrial averages as reported by the U. S. Department of Labor, Bureau of Labor Statistics, and the National Safety Council. [Page J-24].

Because Bechtel Jacobs' performance-based fee was linked to performance objectives,

including the frequency of its incidents of job-related injuries or illness, Defendants had

a financial incentive to falsely report the number, severity, and frequency of injuries and

safety problems.

### Contract Document Retention Requirements

47.    Defendant Bechtel Jacobs was obligated to maintain, in a safe and secure

manner, many documents, which remain the property of the United States

Government, but which are generated or located on the site. In addition,

Page 22 of  45

Defendant Bechtel Jacobs was obligated, during the entire term of the contract, and continuing thereafter, to retain specified records concerning its performance and billing to the government with regard to the contract, including personnel records of former contractor employees, personnel medical records, and personnel radiation exposure records: The contract provisions state:

> (a)  Government owned records.  Except as provided in paragraph (b) of this clause, all records acquired or generated by the Contractor in its performance of this contract shall be the property of the Government and shall be delivered to the Government or otherwise disposed of by the Contractor, either as the Contracting Officer may from time to time direct or in the process of the work, or in any event as the Contracting Officer shall direct upon completion or termination of the contract.
> ****
> (f) ...[T]he Contractor shall retain individual radiation exposure records generated in the performance of work under this contract until DOE authorizes disposal. [Section I-100, Pages I-145, I-146].
>
> The Contractor shall design, develop, or operate the following systems of records on individuals:  personnel records of former contractor employees; personnel medical records; personnel radiation exposure records. [Section H-20, Page H-13].

### Other Contract Requirements

48.    In Section I and Appendix E of the contract, Defendant Bechtel Jacobs agrees that its billings to the Government under the contract will be in full conformance with a long list of requirements, incorporated into the contract by reference, and with which compliance is required by Bechtel Jacobs and its subcontractors.

49.    The Bechtel Jacobs' prime contract with the Department of Energy further provides:

> The Contractor shall comply with the requirements of the DOE Contractor/Employee Protection Program at 10 C.F.R. Part 708 (Whistleblower Protection) with respect to work performed on site at a DOE owned or leased facility.... [Section I-96, Page 143].
>
> (d)  The Contractor is responsible for compliance with the

Page 23 of  45

requirements made applicable to this contract, regardless of the
performer of the work. [Section I-99, Page 145].

### FALSE CLAIMS ACT ALLEGATIONS

50.    In order to receive payment from the United States Government for providing

services pursuant to its Government contracts, Defendants intentionally or

knowingly made, prepared or caused to be made or prepared, false statements

and false claims for payment or approval, based upon the records described

above and intentionally or knowingly presented or caused them to be presented

to an officer or employee of the United States Government in order to obtain

approval and payment from the Government.

51.    Defendant Bechtel Jacobs' records and claims for payment were false or

fraudulent because Defendant falsely and improperly inflated the amount of

radioactively contaminated scrap materials shipped from the site in order to

qualify for a performance award.  The contract provided for such an award if

sufficient quantities of radioactive contaminated materials were timely shipped

from the site.  In order to qualify for the award, Defendant Bechtel Jacobs

created false statements to show that fencing was radioactively contaminated,

when in fact it was not so contaminated.  If accurately reported, this would have

resulted in Bechtel Jacobs not receiving the performance award.

52.    Defendant Bechtel Jacobs' records and claims for payment were false or

fraudulent because Defendant falsely represented, directly or indirectly in

submitting claims for payments, that its management, monitoring, and

environmental remediation work related to the outdoor radioactive material scrap

areas, Building 725 mixed wastes, X-326 facility items, and Landfills X-701B, X-

Page 24 of  45

734A, X-734-B, X-735, X-749, and the Peter Kiewit landfill was in full conformance with contract requirements, including the contract requirements that the sites be maintained in accord with regulatory orders and federal environmental laws.

53.     Defendant Bechtel Jacobs' records and claims for payment were false or fraudulent because Defendant thereby falsely represented that its management, monitoring, and environmental remediation work related to the radiologically contaminated DMSA and PCB spill sites and storage area containing cylinders of depleted uranium hexafluoride ($UF_6$) were in full conformance with contract requirements, including the contract requirements that the sites be: fully identified and accurately disclosed to the Department of Energy as hazards; posted as hazards to prevent injury or illness; and safely managed, monitored, and remediated in accord with applicable federal environmental, health, and safety laws, including but not limited to 10 C.F.R. Part 835.

54.     Defendants Bechtel Jacobs' and SEC's records and claims for payment were false or fraudulent because Defendants thereby falsely represented that work involving toxic, radiological, and hazardous substances at the Portsmouth Gaseous Diffusion Plant was being conducted in accord with contract environmental and health requirements and planned in advance and managed in accord with the contractually-required Safety Management System ("ISMS"), which requires compliance with all applicable environmental, health, and safety laws and regulations, as well as DOE directives, including but not limited to, identification and communication of hazards to the workforce, monitoring of workers, controlling toxic and hazardous substances to prevent further

Page 25 of 45

contamination or exposures, and other efforts to avoid injury, contamination, or worker exposures.

55. Defendants Bechtel Jacobs' and SEC's records and claims for payment were false or fraudulent because Defendants thereby falsely represented that its document maintenance and retention practices were in accord with contract requirements, when in fact Defendants falsely altered, lost, misplaced, shredded, or otherwise destroyed, or caused to be falsely altered, shredded or otherwise destroyed, documents relating to employee exposures, environmental, health, and safety compliance at the site, contractual compliance, dosimetry historical records not maintained, verified or provided to employees, and time and billing for services billed under the contract.

56. Defendant Bechtel Jacobs' records and claims for payment were false or fraudulent because they were based upon time records that were false, including time records of Defendant SEC's employees that were intentionally falsified to show that work compensable under the prime contract was being performed, when in fact it had not been performed; to falsely represent that work was compensable under the contract, when in fact it was not because the time had been spent on non-compensable administrative tasks, in training, in re-work of improperly performed tasks, in breaks, and in non-productive time spent waiting for work to be available; and to falsely inflate the amount of time actually spent on a task or project.

57. Defendants' actions to repeatedly mischarge, either intentionally or knowingly, on their contract and subcontract agreements violated the terms of the prime contract with the Department of Energy.

Page 26 of 45

58. Defendants' obligations to comply with the terms of the prime Government contract is a requirement that may not be waived by any Government employees, other than in limited and appropriate circumstances, the Contracting Officer, if done in writing and otherwise pursuant to applicable law.

59. Defendants' employees on site during the performance of its Government contracts negligently, recklessly, or intentionally violated the provisions of the Government contract and subcontract agreements and thus were knowledgeable about the policies and practices of Defendants in this regard.

60. Defendants' management was aware of Defendants' blatant disregard for contractual requirements, including, but not limited to, Relators' internal reporting of the facts alleged herein.

61. Defendants intentionally, knowingly or recklessly failed to make the necessary inquiry to establish that the claims it submitted to the Government were not false or fraudulent under the False Claims Act.

62. In seeking payment from the Government, Defendant Bechtel Jacobs falsely certified that the payments requested were in accordance with the contract terms when in fact they were not.

63. The requests for payment submitted by Defendant Bechtel Jacobs pursuant to its Government contract were false claims.

64. Relators, the general public, and the United States were harmed by Defendants' actions.

65. This action is not based upon any prior public disclosures, as that term is defined in the False Claims Act, nor have any prior public disclosure of the allegations or transactions alleged in this action occurred, except those initiated or made by

Page 27 of 45

Relators.

66.    Relators are knowledgeable about Defendants' operations and have direct and
       independent knowledge of the information on which these allegations are based
       and are an original source as defined in 31 U.S.C. § 3730(e)(4)(B).  Relators
       have voluntarily provided this information to the Government prior to filing suit,
       including by voluntarily providing extensive and detailed information to former
       DOE Deputy Secretary Michaels, Rep. Strickland, the DOE Inspector General's
       employees, the Department of Justice, and various appropriate DOE employees.

67.    Because of Defendants' actions, Relators were denied the benefit of working for
       an honest employer, experienced the embarrassment of being employed for a
       contractor that cheated the Government, and ███████████████, ███████
       ████████ysical injury, financial losses, termination from employment (in the
       cases of all Relators except Relator Eversole) and mental anguish.

### COUNT I
### VIOLATION OF 31 U.S.C. § 3729(a)

68.    Relators reallege and incorporate by reference each of  the allegations in the
       preceding paragraphs as though fully set forth below.

69.    Defendants knowingly and falsely represented to the Government that they were
       in full conformance with the terms of Bechtel Jacobs' Government contract and
       the Bechtel Jacobs-SEC subcontract agreements in order to obtain payments
       pursuant to the contract between the Government and Defendant, in violation of
       31 U.S.C. §3729(a).

70.    Defendants, by and through their officers, agents, employees, or subcontractors,
       knowingly presented or caused to be presented to an officer or employee of the

Page 28 of  45

United States Government false or fraudulent claims for payment or approval.

71. Defendants, by and through their officers, agents, employees or subcontractors, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved pursuant to contracts with the United States Government.

72. Based on the false claims submitted pursuant to these contracts, Defendants directly or indirectly obtained payment from the United States Government, despite Defendants' knowing or intentional failure to abide by and perform services pursuant to the requirements of the prime contract with the Government.

73. Defendants, by and through their officers, agents, employees, or subcontractors ordered, authorized, and ratified the actions of their various officers, agents, employees, or subcontractors to take the actions set forth above.

74. Defendants knowingly violated the False Claims Act, as that term is defined in 31 U.S.C. § 3729(b).

75. The United States Government has been damaged as a result of Defendants' conduct in violation of the False Claims Act in an amount to be determined at trial.

## COUNT II
### FALSE CLAIMS ACT RETALIATION VIOLATION
### 31 U.S.C. § 3730(h)

76. The allegations of the preceding paragraphs are realleged as if fully set forth below.

77. Defendants have a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions

Page 29 of 45

in furtherance of a False Claims Act action, including investigation for, testimony

for, or assistance in an action filed under this section.

78.　Relators took lawful actions in furtherance of a False Claims Act action, including

investigation for, testimony for, or assistance in an action filed under this section

and, as such, engaged in protected activity under the False Claims Act and other

laws.

79.　While employed by Defendants and, as to Relator McDermott, after his

employment was illegally terminated, Relators repeatedly questioned,

investigated, and reported internally and thereafter to appropriate Government

officials, Defendants' improper practices and billing on its Government contract,

in furtherance of a False Claims Act action.

**Allegations Regarding Relator Borris**

80.　Relator Borris was the SEC Site Manager.  His prior employment record was one

of achievement, due to his focus and the application of his experience and skills

in the area of health and safety.

81.　Once employed by SEC at the Portsmouth site, ostensibly to assist Defendant

Bechtel Jacobs in its contractual obligations to ensure adequate health and

safety management for the site, Relator Borris repeatedly found and was told,

either in word or action (primarily lack of action), that health and safety

contractual obligations were considered by Defendants to be far less important

than other objectives.

82.　Relator Borris determined that Defendants, instead of meeting contract

requirements, represented falsely to the Government that employees were highly

productive in their remediation efforts, that remediation work was proceeding on

Page 30 of  45

schedule, that the work site was incredibly safe and the work performed in fulfillment of health and safety requirements.

83. Relator Borris was instructed by SEC and, at times, directly or indirectly, by Defendant Bechtel Jacobs, that virtually all employee time was to be charged to the DOE contract for reimbursement, rather than what was required under the contract, that unproductive, training, administrative, or overhead time be absorbed by the contractor and subcontractors and not charged to the Government.

84. Relator Borris began to report to his employer, SEC, numerous failures of SEC and Bechtel Jacobs to fulfill DOE contract requirements, jeopardizing the safety of the workforce and the public and misuse of federal funds by Defendants, as more fully described above.

85. Relator Borris, after effectuating no change by going through internal channels, then alerted his Congressman, Representative Ted Strickland, in June 2000, and DOE Deputy Secretary David Michaels, in October 2000, to the serious violations of law he was observing on a regular basis at the site. In retaliation for these public efforts, SEC has retaliated against him and harassed, intimidated, and otherwise created a hostile work environment for Relator Borris.

86. In August 2000, just after articulating a concern that poor safety oversight was jeopardizing worker safety at the site, Relator Borris was demoted by Defendant SEC from Site Manager to Manager of Large Projects, with a fraction of his prior employees to supervise.

87. Only several days after his demotion, a site employee was involved in a potentially fatal accident resulting in severe burns that left the worker in hospital

intensive care in critical condition for an extended period of time. The accident was the result of a serious lapse in health and safety management and oversight, the same poor safety oversight that Relator Borris had complained about and which resulted in his demotion.

88.    In September 2000 in retaliation for his reporting of Defendants' wrongdoing and his investigation and other acts in furtherance of this action, Defendant SEC summarily suspended Relator Borris without good cause, falsely alleging that a minor verbal disagreement with a co-worker justified the extreme action, and summarily required that he leave the premises, ensuring it by requiring that he exit the site with an armed guard escorting him.

89.    Defendant SEC did not reinstate Relator Borris until October 2000, when it learned that Relator Borris' revelations to DOE authorities in furtherance of this action had resulted in the DOE Deputy Secretary Michaels, requesting to meet with Relators Borris, Eversole, and Gossett. That meeting occurred in October 2000 in Washington, D.C., and lasted some 90 minutes.

**Allegations Regarding Relator Eversole**

90.    Relator Eversole is the Bechtel Jacobs Portsmouth Project Health Physicist.

91.    Relator Eversole has been retaliated against by Defendant Bechtel Jacobs for actions taken in furtherance of this action, including but not limited to investigating and reporting to other Bechtel Jacobs management and DOE Inspector General various radiological safety violations, radiological safety deficiencies, and health and safety management deficiencies that violate that contractual requirements and, thus, should preclude Defendants from billing the Government for services not performed or performed only in part.

Page 32 of 45

92.    Relator Eversole's job position and the DOE contract requires coordination of

SEC radiation control ("RADCON") work with remediation efforts by the Bechtel

Jacobs hourly workforce, to avoid excessive time charges by SEC for its

RADCON employees.  To do this effectively, he must be informed well in

advance of the remediation work plans, known as the "90 Day Forecast."  For

over 18 months, Defendants have refused to provide Relator Eversole with that

forecast in advance.  When he has had access to it, he has reported internally

that the staffing is excessive, resulting in retaliation against him by Defendants.

93.    Relator Eversole has investigated and reported internally, to Defendant's

management, and to appropriate Government officials, including DOE, a variety

of False Claims Act violations by Defendants resulting in an increased risk to the

workforce and the public to exposure to radiological does or contamination,

including, but not limited to, the following:

> Violations of 10 CFR 835
> Lack of health and safety management over the RADCON program
> Failure to have an adequate "Routine Survey Program".
> Inadequate RADCON surveys of contaminants in the workplace
> Unnecessary surveying in excess of requirements to illegally increase
> billings under the contract to the Government
> Failure of RADCON surveys to follow standard industry practices
> regarding radioactivity readings
> Improper analysis of removable contamination smears
> Alteration and falsification of radiological survey records, such as in the X-
> 345 mid-2001 and P-101 Waste Shipment surveys increasing potential to
> expose employees and public to radiological materials allowed to
> improperly leave the site
> Failure to air sample in the cylinder logs and in X-744G
> Failure to meet contractual requirements to post environmental hazards at
> the site, including Radioactive Material Areas (RMA) with no property
> boundary identifiers, unclear postings, inconsistent postings, inappropriate
> handwritten instructions on postings
> Inadequate management to make clear what contractor or subcontractor
> is primarily responsible to ensure proper postings
> Errors in posting in part of the X-345 facility

Page 33 of  45

SEC intentionally moving a radiologically contaminated bottle in the X-7725 4th Floor "Poly bottle Storage Area" in violation of law.

94.  Defendants have retaliated against Relator Eversole by not providing him with timely information and communications essential to adequately perform his job and fulfill contract requirements and by structuring the contract and technical interaction between Bechtel Jacobs and the SEC RADCON program in a way that omitted his involvement. Nonetheless, Defendants bill the Government as if Relator Eversole's safety and oversight management work was occurring.

95.  In December 2001, Relator Eversole was ordered by his manager to stop document and reporting RADCON deficiencies and related failures to fulfill DOE contract requirements, which documentation was derogatorily referred to in his formal personnel evaluation as "poison pen letters."

96.  Relator Eversole has reported to his employer, Defendant Bechtel Jacobs, numerous failures of Defendants SEC and Bechtel Jacobs to fulfill DOE contract requirements, jeopardizing the safety of the workforce and the public and misuse of federal funds by Defendants, as more fully described above.

97.  Relator Eversole, after effectuating no change by going through internal channels, then alerted his Congressman, Representative Ted Strickland, in June 2000 and DOE Deputy Secretary David Michaels in October 2000, to the serious violations of law he was observing on a regular basis at the site. In retaliation for these public efforts, Defendants have harassed, intimidated, and otherwise created a hostile work environment for Relator in retaliation for his reporting of Defendants' wrongdoing and his investigation and other acts in furtherance of this action, without good cause.

Page 34 of 45

## Allegations Regarding Relator Gossett

98.  In 1999, Relator Gossett began to report to his employer, SEC, numerous
     failures of SEC and Bechtel Jacobs to fulfill DOE contract requirements,
     jeopardizing the safety of the workforce and the public and misuse of federal
     funds by Defendants, as more fully described above.

99.  Relator Gossett, after effectuating no change by going through internal channels,
     then alerted his Congressman, Representative Ted Strickland, in June 2000 and
     DOE Deputy Secretary David Michaels in October 2000, to the serious violations
     of law he was observing on a regular basis at the site.  In retaliation for these
     public efforts, SEC has harassed, intimidated, and otherwise created a hostile
     work environment for Relator Gossett.  Defendant SEC falsely accused Mr.
     Gossett of inadequate job performance, improperly limited his management
     authority, isolated him by denying him the opportunity to participate in
     management meetings which he formerly attended and which, in his position, he
     should have attended.

100. Shortly after his October 2000 attendance at a meeting in Washington, D.C. with
     Deputy Secretary Michaels to discuss matters at issue in this lawsuit, Mr.
     Gossett received a disciplinary letter for attending an on-site  meeting to discuss
     safety at the Portsmouth site, on the grounds that in attendance at that meeting
     was another site employee who was known by Defendant SEC to be a
     "whistleblower."

101. Defendant SEC has threatened Relator Gossett with loss of employment and
     subjected him to unwarranted adverse disciplinary action.

102. Defendants have admitted, by and through their agents, in sworn testimony, that

Page 35 of  45

Relator Gossett was considered by them to be a "whistleblower" and that such status was viewed negatively by Defendants.

103. On January 14, 2002, Relator Gossett was illegally and abruptly terminated without good cause and because of his actions in furtherance of an action under the False Claims Act and his related efforts to prevent further wrongdoing and violations of state and federal environmental, health, and safety laws by Defendants.

### Allegations Regarding Relator McDermott

104. Relator McDermott was hired by Defendant McDonald Corp. to perform quality assurance duties, with his first day of employment on August 23, 1999.

105. In connection with his work, Relator McDermott filled out time sheets in a proper fashion, allocating time to both administrative (non-billable to the DOE contract) and quality assurance (billable to the contract). He was then ordered by the President, John A. McDonald, to fabricate some quality assurance tasks to substitute for the administrative tasks he accurately recorded on his time records. When he refused to do so, he was summarily terminated, although he was soon after reinstated, after objecting to the termination.

106. Relator McDermott was instructed by Defendant McDonald and, at times, directly or indirectly, by Defendant Bechtel Jacobs, that virtually all employee time was to be charged to the DOE contract for reimbursement, rather than what was required under the contract, that unproductive, training, administrative, or overhead time be absorbed by the contractor and subcontractors and not charged to the Government.

107. In January 2000, following various investigatory and other efforts of Relators

Page 36 of 45

regarding False Claims Act violations by Defendants, Relator McDermott

attended a meeting where Bechtel Jacobs officials discussed an upcoming DOE

visit to the site.  Eventually, Bechtel Jacobs instructed the staff present not to

"volunteer" information to any DOE inspectors who were expected to visit the site

in the near future for an environmental safety and health investigation.  Bechtel

Jacobs eventually went so far as to distribute forms that were to be completed in

the event of any conversation with the DOE inspectors, with employees and

subcontractor employees to specify exactly what was discussed.

108.    Relator McDermott publicly stated in the January 2000 meeting that his prior

work experience as a former Tennessee State investigator had led him to the

conclusion that some of the most helpful information that he obtained and which

resulted in citations for violations of law was that which was volunteered and

which came from unfettered dialogue with workers.

109.    When the responsible Department of Energy officials at the highest levels

learned of Bechtel Jacobs' instructions to workers that they not discuss matters

with DOE and to fill out a detailed form if they did, Bechtel Jacobs retracted the

instructions.

110.    In March 2000, in retaliation for his insistence upon accurate time reporting of

Defendants' wrongdoing, his willingness to cooperate with DOE investigators,

and his investigation and other acts in furtherance of this action, Defendant

McDonald summarily terminated Relator McDermott without good cause.

**Allegations Regarding All Relators**

111.    Defendants knew or should have known that Relators' activities investigating and

opposing their unlawful conduct, including their investigation for, testimony for, or

assistance in an action filed under this section, were in connection with this False Claims Act action.

112.    Defendants retaliated against Relators for their lawful actions taken in furtherance of a False Claims Act action, including but not limited to their investigation and assistance in an action alleging Defendants' violations of the False Claims Act and Relators' efforts to prevent further False Claims Act violations by Defendants.

113.    Relators reported, at various times, all of the above violations of law recited in this Complaint, to their superiors at the site, to various officials at DOE, and to various officials at the Department of Justice, prior to filing this action.

114.    Relators were and continue to be discriminated against in the terms and conditions of their employment by Defendants Bechtel Jacobs, SEC, and McDonald Consulting Corp., by and through their officers, agents, and employees because of lawful acts done by them in furtherance of an action under the False Claims Act.

115.    The actions of Defendants' Bechtel Jacobs, SEC, and McDonald Consulting Corp. damaged and continue to damage Relators in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial as a result of Defendant's actions in this regard.

116.    Defendants' misconduct and illegal treatment of Relators and those they derogatorily consider "whistleblowers" has the effect of creating an unsafe atmosphere at a dangerous workplace, because it has the effect of stifling reports of safety problems or illegal conduct and effectively warning other employees and subcontractors that they should not engage in honest and open

reporting of environmental, health and safety concerns at the Portsmouth site, making temporary, preliminary, and permanent injunctive or equitable relief appropriate, in order to prevent further irreparable harm to Relators and to prevent additional irreparable harm to others and the public caused by Defendants' retaliation against those viewed derogatorily as "whistleblowers."

117.    Pursuant to 31 U.S.C. § 3730(h), Relators are entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of their reputations career goals and the pursuit of their retaliation claims.

## COUNT III

## Ohio PUBLIC POLICY TORT

118.    The allegations of the preceding paragraphs are realleged as fully set forth below.

119.    Defendants have a duty under various provisions of federal law, including but not limited to, 15 U.S.C. § § 2622, 2651, 29 U.S.C. § 660(c), 33 U.S.C. § 1367, 10 C.F.R. Part 708, and 42 U.S.C. § § 300j-9, 5851, 7622, to refrain from discriminating against employees who assist in proceedings to carry out the purposes of the Clean Air Act, the Clean Water Act, the Toxic Substance Control Act, Resource Conservation and Recovery Act, the Occupational Safety and Health Act, and other federal laws.

120.    Defendants have a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section.

121.    Defendants have a duty under the False Claims Act, 31 U.S.C. § 3729, et seq.,

Page 39 of 45

18 U.S.C. § 1001, and Ohio Rev. Code § 2921.13 to refrain from knowingly making false statements to representatives of the United States concerning compliance with the provisions of its Government contracts.

122.   Defendants have a duty under the Ohio Whistleblower Act, Ohio Rev. Code § 4113.52, to refrain from taking retaliatory actions against employees who report potential violations of law which are likely to cause a hazard to public health or safety or which may be a felony.

123.   In retaliation against Relators for their efforts to correct Defendants' False Claims Act violations and other violations of law, Defendants discriminated against Relators.

124.   Defendants' retaliation against Relators is a direct violation of public policy under the principles enunciated in <u>Greeley v. Miami Valley Maintenance Contractors, Inc.</u>, 49 Ohio St. 3d 228, 551 N.E.2d 981 (1990) and <u>Painter v. Graley</u>, 70 Ohio St. 3d 376, 639 N.E.2d 51 (1994) and has caused damage to Relators.

125.   Defendants' retaliation against Relators is in direct violation of the public policy of the State of Ohio and of the United States, under the principles enunciated in 18 U.S.C. § 1001, 10 U.S.C. § 2409, 41 U.S.C. § 265, 42 U.S.C. § 7622, and 31 U.S.C. § 3729, et seq., including 31 U.S.C. § 3730(h) and has caused damages to Relators.

126.   Defendants' conduct is outrageous and is motivated by ill-will, spite, hatred, and is in the spirit of retaliation or revenge and is in disregard of Relators' legal rights and has permanently damaged them.

**COUNT IV**
**Ohio Whistleblower Act**

Page 40 of 45

127. The allegations of the preceding paragraphs are realleged as fully set forth below.

128. Relators reported to proper authorities, including, inter alia, the Department of Energy and Department of Justice, potential or actual violations of laws which they believed were likely to cause a hazard to public health or safety or which may be a felony.

129. Defendants have a duty under the Ohio Whistleblower Act, Ohio Revised Code § 4113.52, to refrain from taking retaliatory actions against employees who report potential violations of law which they believe are likely to cause a hazard to public health or safety or which may be a felony.

130. In retaliation against Relators for their efforts to report potential violations of law which potential violations of law which they believe are likely to cause a hazard to public health or safety or which may be a felony and other violations of law, Defendants discriminated against Relators and continues to discriminate against them in the terms and conditions of their employment. As to Relators Gossett and McDermott, the discrimination is continuing as Defendants falsely persist in claiming that they were terminated for cause, when in fact the terminations were retaliatory and in violation of the Ohio Whistleblower Act and Ohio public policy.

131. Defendants' retaliation against Relators is a direct violation of the Ohio Whistleblower Act, Ohio Revised Code § 4113.52, and has caused damages to Relators.

132. Defendants' conduct is outrageous and is motivated by ill-will, spite, hatred, and is in the spirit of retaliation or revenge and is in disregard of Relators' legal rights and has permanently damaged them.

## PRAYER

WHEREFORE, on Count I, Relators, on behalf of them and the United States Government, pursuant to 31 U.S.C. §3730(c)(5) and (d) pray:

a.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of at least $5,000 to $10,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including the costs to the United States Government for its expenses related to this action;

b.     That in the event that the United States Government continues to proceed with this action, or proceeds with any alternate remedy available to the Government, Relators be awarded an amount for bringing this action of at least 15%, but not more than 25%, of the proceeds of this action and the alternate remedy or the settlement of any such claim;

c.     That in the event that the United States Government does not proceed with this action, but pursues an alternate remedy, Relators be awarded an amount the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25% nor more than 30% of the proceeds of this action and the alternate remedy or the settlement of any such claim; and

d.     That the United States Government and Relators receive all relief, both at law and at equity, to which they may reasonably appear entitled.

WHEREFORE, on Counts II, III, and IV, Relators pray:

a.     That they be awarded all compensatory and punitive damages, including

Page 42 of 45

personal injury damages for pain, suffering, and physical and emotional

distress, and loss of reputation, to which they are entitled pursuant to 31

U.S.C. § 3730(h) and other applicable law, including Ohio law;

b.   That they be awarded all compensatory and punitive damages arising

from their employment discrimination pursuant to 31 U.S.C. § 3730(h) and

other applicable law, including Ohio law;

c.   That they be provided with temporary or preliminary injunctive or equitable

relief, as may be appropriate, to prevent further harm to themselves and

to prevent the harm to others and the public caused by Defendants'

retaliation against those viewed derogatorily as "whistleblowers;"

d.   That they be awarded all litigation costs and reasonable attorneys' fees

incurred as provided pursuant to 31 U.S.C. § 3730(h) and other applicable

law; and

e.   That they receive all relief, both at law and at equity, to which they may

reasonably appear entitled.

Respectfully submitted,

Joseph R. Egan, Esq.
Charles Fitzpatrick, Esq.
Egan & Associates, PLLC
Attorneys for Relators

7918 Jones Branch Drive, Suite 600
McLean, VA 22102
Telephone: (703) 918-4942
Fax: (703) 918-4943 (fax)
jegan@nuclearlawyer.com

1777 N.E. Loop 410 Suite 600
San Antonio, TX 78217
Telephone: (210) 820-2667
Fax: (210) 820-2668
cfitzpatrick@nuclearlawyer.com

Page 43 of 45

Ann Lugbill, Esq. (0023632)
Trial Attorney for Relators
2406 Auburn Avenue
Cincinnati, Ohio 45219
Telephone: (513) 784-1280
Fax: (513) 784-1449
alugbill@choice.net

## Certificate of Service

I hereby certify that a copy of the foregoing was served by hand delivery upon the Assistant United States Attorney for the Southern District of Ohio and by regular mail delivery upon the United States Attorney General on January 25, 2002.

Ann Lugbill

# PATRICK, BEARD, SCHULMAN & JACOWAY, P.C.

A PROFESSIONAL CORPORATION

ATTORNEYS AND COUNSELORS AT LAW

SUITE 202, MARKET COURT

537 MARKET STREET

CHATTANOOGA, TENNESSEE 37402-1240

GARY R. PATRICK*
JOHN W. BEARD*
RICHARD A. SCHULMAN
STEVEN M. JACOWAY*
CARA J. ALDAY*
JERRE B. MOSLEY
R. JONATHAN GUTHRIE
CARTER J. LYNCH, III
L. BLAIR BENNINGTON
SUSIE LODICO

* ALSO LICENSED IN GEORGIA

TELEPHONE (423) 756-7117
FACSIMILE (423) 267-5032

GARY R. PATRICK
E-MAIL Address:
gpatrick@pbsjlaw.com

June 7, 2007

Ms. Kristen E. Poplar
Chubb & Son
Sears Tower, Suite 4700
233 S. Wacker Drive
Chicago, IL  60606-6303

**In re:  Insured:  Safety & Ecology Corporation**
**Policy #:  8166-0873**
**Case:  Borris, et al. v. Safety & Ecology Corporation**

Dear Ms. Poplar:

Please be advised that our firm represents Safety & Ecology Corporation in connection with its claim against Chubb & Son. Chubb & Son issued the above-referenced policy to Safety & Ecology Corporation ("SEC"), which among other things included coverage for employment practices liability coverage and defense cost coverage, as clearly set forth in the declaration page to the policy.

Under Section I (D), the Company, Executive Risk Specialty Insurance Company, agrees to pay on behalf of SEC losses from claims for Wrongful Acts. The definition of Wrongful Acts is contained in Section II. Section II (G)(1) through (7) defines Employment Practices Wrongful Act. Among other things, this definition includes workplace harassment, retaliatory treatment and other work-related activities. In addition, Subparagraph II (E) defines Defense Expenses as reasonable legal fees and expenses incurred by SEC in either the defense or appeal of such a claim.

In addition, Section I (C) provides that the Underwriter has a duty to defend any claim as defined in the policy, even if such claim is groundless, false or fraudulent.

As you may be aware, a settlement agreement has been reached, but not yet consummated, in the above-styled case. The individual plaintiffs and SEC have agreed that SEC will pay to the individual plaintiffs designated in the release the total sum of $40,000. The only thing left to be done is to obtain the approval of the US government. This should be done shortly.



EXHIBIT

In addition to the $40,000 being paid to the individual plaintiffs, through May 14, 2007, SEC has paid defense cost of $78,580. This totals, through May 14, 2007, $118,580. There will obviously be a few additional legal expenses in wrapping up this litigation.

This letter is a formal demand upon Chubb Insurance Company to pay the $118,580. We believe it is very clear that under the above-reference policy, Chubb has an obligation and liability to pay this amount.

We believe that sufficient notices have been provided to you to come within T.C.A. §56-7-105. However, in order not to leave any question about the demand of SEC, this demand is being made on Chubb & Son Insurance Company and Executive Risk Specialty Insurance Company, and any other insurer under this policy, that unless the amount of $118,580.00 is paid within sixty (60) days of the date of this letter, we will ask the court and/or jury for an additional award of 25% pursuant to T.C.A. §56-7-105, and all other Tennessee statutes and common law.

If you have any questions, please feel free to contact the undersigned.

Sincerely,

Gary R. Patrick
For the Firm

GRP:nlj

CC:    Mr. Raymond A. Peters

# State of Tennessee
## In the Circuit Court of Hamilton County

SAFETY AND ECOLOGY CORPORATION,

    Plaintiff,

v.

CHUBB & SON INC.,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)

2007 AUG 29 PH 3:43

PAULA T. THOMPSON, CLERK

Docket No. 07C1013

Division ____

**JURY DEMAND**

## SUMMONS
### TO BE SERVED THROUGH KNOX COUNTY SHERIFF'S DEPARTMENT

To:   Chubb & Son, Inc. c/o Registered Agent C T Corporation System

     800 S. Gay Street, Suite 2021, Knoxville, Tennessee 37929

     Defendant                   Address

    You are hereby summoned to answer and make defense to a bill of complaint which has been filed in the Circuit Court of Hamilton County, Tennessee in the above styled case. Your defense to this complaint must be filed in the office of the Circuit Court Clerk of Hamilton County, Tennessee on or before thirty (30) days after service of this summons upon you. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

    WITNESSED and Issued this   29   day of   August  , 2007.

                                  Paula T. Thompson, Circuit Court Clerk

                             By  H. Munson

                                   Deputy Circuit Court Clerk

         **PATRICK, BEARD, SCHULMAN & JACOWAY, P.C.**

Attorneys for Plaintiff   Gary R. Patrick, #1941

         537 Market Street, Suite 202, Chattanooga, TN 37402  (423) 756-7117

                        Address

Plaintiff's Address ____

Received this   4   day of   Sept.  , 2007

                        /S/  Jack Dixon

                              Deputy Sheriff

## COST BONDS

I hereby acknowledge and bind myself for the prosecution of this action and payment of all costs in this court which may at any time be adjudged against the plaintiff in the event said plaintiff shall not pay the same.

Witness my hand this ____ day of ____, 20____.

                                       Surety

                                       Address

# State of Tennessee,
County of Hamilton

I, Paula T. Thompson, Clerk of the Circuit Court in and for the State and County aforesaid, hereby certify that the within and foregoing is a true and correct copy of the original writ of summons issued in this case.

**Paula T. Thompson**, Circuit Court Clerk

By _____ D.C.

---

## OFFICER'S RETURN

I here by certify that I served this summons together with the complaint as follows:

On, _____9 - 27 -_____, 2007, I delivered a copy of the summons and complaint to the defendant.

~~Served Special Assistant Secretary for Service of Process to C.T. Corporation System, the Registered Agent for~~ *Chubb & Son, Inc.*

Failed to serve this summons within 30 days after its issuance because:

_____

**John Cupp, Sheriff**

Deputy Sheriff _____Jack Dixon_____

---

## CLERK'S RETURN

I hereby acknowledge and accept service of the within summons and receive copy of same, this ____day of _____, 2007.

_____
Defendant

**Paula T. Thompson**, Circuit Court Clerk

By _____ D.C.

---

### NOTICE TO DEFENDANT (S)

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued in the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

STATE OF TENNESSEE )

COUNTY OF HAMILTON )


I, PAULA T. THOMPSON, Clerk of the Circuit Court in and for
the State and County aforesaid, hereby certify that the foregoing
is a full, true and correct copy of the entire file in the case
of:

SAFETY AND ECOLOGY CORPORATION

VS.

CHUBB & SON INC.,

DOCKET NO. 07C1013

as the same appears of record and on file in my office.
appears in Record Book  , Page  .

Witness my hand and the seal of the Court, this _26th_ day of
_October,_  _2007_.


PAULA T. THOMPSON, CLERK

BY: _Patty Counts_____DC